

Hughes Hubbard & Reed LLP
1775 I Street, N.W.
Washington, D.C. 20006-2401
Office:+1 (202) 721-4600
Fax: +1 (202) 721-4646
hugheshubbard.com

July 17, 2023

Molly C. Dwyer
Clerk of the Court
U.S. Court of Appeals for the Ninth Circuit
95 Seventh Street
San Francisco, CA 94103

Re: *Best Sunshine International, LTD (BVI) v. Commonwealth Casino Commission*, No. 22-16630
Memorandum Disposition dated June 28, 2023
Panel Members: Bade, Bumatay, Sanchez

Dear Ms. Dwyer:

Pursuant to Federal Rule of Appellate Procedure 28(j), Plaintiffs-Appellees Imperial Pacific International (CNMI), LLC and Best Sunshine International, Ltd. (BVI) provide notice of the Second Circuit's recent decision in *Olin Holdings Ltd. v. State of Libya*, No. 22-825-cv (July 12, 2023), attached as Exhibit 1. This decision is directly relevant to Plaintiffs-Appellees' arguments in its July 12, 2023 Petition for Panel Rehearing and Rehearing *En Banc* ("Petition").

First, *Olin Holdings* supports Plaintiffs-Appellees' contention that by entering the Joint Statement and selecting the AAA-ICDR rules therein, the parties agreed to arbitrate questions of arbitrability. *See Olin Holdings*, at 13-14 (affirming district court holding that the parties' agreement—contained in "Terms of Reference"—at the beginning of an arbitration, in which they chose procedural rules delegating arbitrability to the arbitrators, is clear and unmistakable evidence of the parties' intent to arbitrate arbitrability).[1]

---

[1] Although not the basis of the Petition, *Olin Holdings* supports a finding that the selection of AAA arbitration in the CLA constitutes a selection of the AAA-ICDR rules, even without explicitly stating which rules apply. *Olin Holdings*, at 26 (finding that the parties "clearly and unmistakably" agreed to submit questions of

Second, *Olin Holdings* supports Plaintiffs-Appellees' argument that by agreeing to a bifurcated arbitration, Commonwealth Casino Commission ("CCC") indicated its intent to submit arbitrability to the arbitrator. *See Olin Holdings*, at 27-28 (Respondent "'clearly and unmistakably' agreed to send questions of arbitrability to the Tribunal" when it agreed to bifurcate the arbitration into jurisdictional and merits phases.).

Third, *Olin Holdings* supports Plaintiffs-Appellees' argument that by presenting its arbitrability challenges to the arbitrator, CCC indicated its intent to submit arbitrability questions to the arbitrator. *See Olin Holdings*, at 29 ("Unlike the respondents in *First Options*, who participated in the arbitration only to object to the arbitrability of the dispute, [Respondent] participated in the entire proceeding and, in fact, independently urged the Tribunal to decide issues of arbitrability." (citing 514 U.S. 938, 946 (1995)).

Plaintiffs-Appellees respectfully submit this decision for consideration.

Best regards,

*s/ Samuel W. Salyer*

Samuel W. Salyer

Attachment

cc: Keisha Blaise
Alison Nelson
Counsel for Defendant-Appellant

---

arbitrability to the arbitrator where their contract authorized submission of disputes to the ICC and therefore presumptively incorporated ICC Rules).

# Exhibit 1

22-825-cv
*Olin Holdings Ltd. v. State of Libya*

# In the United States Court of Appeals for the Second Circuit

---

August Term 2022
No. 22-825-cv

OLIN HOLDINGS LIMITED,
*Petitioner-Appellee*,

v.

STATE OF LIBYA,
*Respondent-Appellant*.

---

ARGUED: MAY 15, 2023
DECIDED: JULY 12, 2023

---

Before: CALABRESI, LOHIER, and KAHN, *Circuit Judges*.

---

Respondent-Appellant the State of Libya ("Libya") appeals from the judgment of the United States District Court for the Southern District of New York (Koeltl, *J.*) granting Petitioner-Appellee Olin Holdings Limited's ("Olin") petition to confirm an arbitration award issued under a bilateral investment treaty between Libya and the Republic of Cyprus and denying Libya's cross-motion to dismiss the petition on *forum non conveniens* grounds. On appeal, Libya's primary argument is that the district court erred by declining to independently review the arbitrability of Olin's claims before confirming the final award. We disagree and hold that Libya was not entitled to *de novo* review of the arbitral tribunal's decisions because it "clear[ly] and unmistakab[ly]" agreed to submit questions of arbitrability to the arbitrators in the first instance. *See First Options of Chi., Inc. v.*

*Kaplan*, 514 U.S. 938, 944 (1995) (alterations and internal quotation marks omitted). We further conclude that the district court properly confirmed the final award and rejected Libya's cross-motion to dismiss the petition.

We therefore **AFFIRM** the judgment of the district court.

---

KEVIN A. MEEHAN (Joseph D. Pizzurro, Andrew Larkin, Jean Lambert, *on the brief*), Curtis, Mallet-Prevost, Colt & Mosle LLP, New York, NY, *for the Respondent-Appellant*.

JAMES E. BERGER (Charlene C. Sun, Erin Collins, *on the brief*), DLA Piper LLP, New York, NY, *for Petitioner-Appellee*.

John C. Canoni, DLA Piper LLP, Dallas, TX, *for Petitioner-Appellee*.

---

MARIA ARAÚJO KAHN, *Circuit Judge*:

In December 2020, Olin Holdings Limited ("Olin") filed a petition in the United States District Court for the Southern District of New York seeking to confirm a final arbitral award ("Final Award") issued by the Arbitral Tribunal ("Tribunal") of the International Chamber of Commerce ("ICC") in Paris, France. The Final Award was the result of an arbitration initiated by Olin against Respondent-Appellant the State of Libya ("Libya") under a 2004 bilateral

Case 22-825, Document 32-1, 07/17/2023, 3540201, Page3 of 36

investment treaty between Libya and the Republic of Cyprus ("Cyprus").[1] The subject of the arbitration was the alleged expropriation of a dairy factory that Olin owned and operated in Tripoli, Libya. After several years of proceedings, the Tribunal concluded that it had jurisdiction over the dispute and issued a decision in favor of Olin. Shortly thereafter, Olin sought confirmation of the Final Award in the district court. On March 22, 2022, the district court (Koeltl, *J.*) granted Olin's motion and denied Libya's cross-motion to dismiss the petition on *forum non conveniens* grounds.

On appeal, Libya argues that the district court erred by failing to independently review the Tribunal's jurisdictional decision because the decision turned on an issue of "arbitrability," and the parties did not "clearly and unmistakably" agree to submit questions of arbitrability to the Tribunal. Libya further argues that the district court erred in confirming the Final Award under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, commonly known as the "New York Convention." Finally, it argues that the

---

[1] *See* The Agreement on the Promotion and Reciprocal Protection of Investments between the Government of the Republic of Cyprus and the Great Socialist Libyan Arab Jamahiriya, February 12, 2005.

district court improperly denied its motion to dismiss the petition for *forum non conveniens*.

As explained below, we find each of Libya's arguments unavailing. Assuming, without deciding, that the Tribunal's jurisdictional decision was a decision on the substantive arbitrability of the parties' dispute, we hold that Libya indisputably agreed to arbitrate such issues when it signed a treaty providing Cypriot investors with the option of resolving disputes under the arbitral rules of the ICC. We further conclude that the district court did not err in confirming the Final Award and properly rejected Libya's motion to dismiss the petition on *forum non conveniens* grounds.

**BACKGROUND**

In June 2004, Cyprus and Libya (the "Contracting Parties") signed a bilateral investment treaty, formally known as the Agreement on the Promotion and Reciprocal Protection of Investments between the Government of the Republic of Cyprus and the Great Socialist Libyan Arab Jamahiriya (the "BIT"). J. App'x at 154–65. The BIT provides protections and guarantees for the investors of each country when making investments in the other. As relevant here, Article 7(1) of the BIT provides that the investments made by the nationals of one Contracting

Party in the territory of the other "shall not be nationalized, [or] expropriated . . . , except for [in the] public interest in accordance with due process of law, on a non-discriminatory basis and against the payment of prompt, adequate and effective compensation." BIT, art. 7(1). An investor who is impacted by such nationalization or expropriation is given, in Article 7(4), the "right, under the law of the Contracting Party making the expropriation, to prompt review, by a judicial authority or other competent and independent authority of the Contracting Party, of its case." *Id.* art. 7(4).

Article 9 of the BIT establishes procedures for the resolution of disputes that arise between a Contracting Party and an investor of the other state. Specifically, Article 9(2) provides that in the event a dispute cannot be settled within six months, it "shall be submitted at the choice of the investor" to:

> a) the competent court of the Contracting Party in whose territory the investment was made; or
>
> b) the Arbitral Tribunal of the International Chamber of Commerce in Paris; or
>
> c) the International Centre for the Settlement of Investment Disputes . . . ; or
>
> d) the Arbitration Institute for the Arbitral Tribunal of the Chamber of Commerce in Stockholm.

*Id.* art. 9(2). Article 9(5) further provides that "[t]he awards of arbitration shall be final and binding on both Parties to the dispute." *Id.* art. 9(5). The BIT went into force on February 12, 2005.

Olin is a limited liability company organized under the laws of Cyprus with its principal place of business in Cyprus. At all relevant times, Olin was wholly owned by Akram Abughamja, a citizen of Libya. Between 2005 and 2006, Olin constructed a juice and dairy factory on land leased from Abughamja's father, Said Abughamja, in an industrial neighborhood in Tripoli. On November 12, 2006, just before the factory became fully operational, Olin received an eviction order informing it that "its factory has been dispossessed and requesting it to vacate the premises within 3 days." J. App'x at 38. Unbeknownst to Olin, a Libyan governmental entity had issued a decision on October 19, 2006 (the "Expropriation Order"), expropriating a large parcel of land, which included Olin's factory.

Within three months of Olin's receipt of the Expropriation Order, "Libya had demolished the quasi totality of the Expropriated Area, leaving Olin's factory as one of the few buildings standing." *Id.* at 39. Olin sent several letters between November 2006 and June 2009 to Libyan authorities seeking an exemption from the Order. No exemption was granted.

On December 9, 2006, Olin initiated judicial proceedings challenging the legality of the Expropriation Order in the Tripoli Court of Appeal, First Administrative Circuit. In a written decision dated April 13, 2010, the administrative court annulled the Order, concluding that it was issued in violation of Libyan law regulating the expropriation of foreign investments. Notwithstanding the administrative court's decision, on August 31, 2010, Libyan authorities sent a letter to Olin demanding that it "evacuate the site . . . and deliver it free of all obstacles and people within a week . . . ." *Id.* at 41 (emphasis omitted).

On December 7, 2010, Olin filed a second lawsuit in the South Tripoli Court of First Instance (the "South Tripoli Court"), seeking €57 million in damages for alleged business interruptions caused by the Expropriation Order. While that case was pending, on June 15, 2011, the Libyan authorities transferred title to the land on which Olin's factory was built back to Said Abughamja. On February 14, 2014, the South Tripoli Court denied Olin's indemnification claim, concluding that it had failed to establish that it suffered economic harm due to the Expropriation Order.[2]

[2] The four-year delay in the South Tripoli Court's adjudication of Olin's claims was caused by the 2011 popular uprising in Libya, which overthrew the regime of Muammar Gaddafi. *See* J. App'x at 42.

On July 3, 2014, Olin commenced an arbitration proceeding against Libya before the ICC pursuant to Article 9(2) of the BIT.[3] In its request for arbitration, which was served on Libya on September 3, 2014, Olin requested $147,882,000 in compensation for damages it allegedly incurred as a result of the Expropriation Order and Libya's related actions obstructing the operation of the factory. From the outset, Libya participated in all aspects of the arbitration and was represented by counsel. The Tribunal consisted of a representative appointed by Libya, a representative appointed by Olin, and a representative appointed by the ICC.

The Tribunal held a preliminary meeting with the parties on June 29, 2015. During that meeting, the parties agreed to, and signed, the "Terms of Reference" ("TOR"), which set out the procedural and substantive rules of the arbitration and summarized the parties' respective claims, including Libya's claim that the Tribunal lacked jurisdiction over the dispute due to Olin's prior litigation in Libya. Regarding the scope of the arbitration, the TOR stated that the Tribunal had the authority to decide "those [issues] resulting from the Parties' submissions . . . which are relevant to the adjudication of the Parties' respective claims and

[3] On March 13, 2014, Olin submitted a written notice to Libya pursuant to Article 9(1) of the BIT informing Libya of its dispute and inviting Libya to discuss a negotiated settlement. Olin attached a draft copy of its request for arbitration to the written notice.

defenses, as described [in the TOR]." *Id.* at 397. The TOR additionally recounted the parties' agreement that the Tribunal would be governed by the Rules of Arbitration of the ICC (the "ICC Rules").

During the preliminary meeting, the parties also agreed to a "provisional timetable" for the proceedings. As reflected in the Tribunal's July 3, 2015, "Procedural Order No. 2," the parties agreed to divide the arbitration into two phases, the first addressing Libya's opposition to the Tribunal's jurisdiction and the second, if necessary, addressing the merits of Olin's underlying claims. The parties submitted their written "Submissions on Jurisdiction" between August and October 2015.

In its submissions, Libya argued that the Tribunal lacked jurisdiction over the instant dispute because, *inter alia*, Article 9(2) of the BIT requires investors to make a "final and irrevocable" choice between litigation and arbitration and Olin, having first litigated the dispute in Libyan courts, was precluded from "submit[ting] [the] dispute to an arbitral tribunal." *Id.* at 276. In response, Olin argued that "[t]he language of Article 9[(2)] of the BIT does not indicate that the choice offered therein is final, definitive and preclusive of other choices." *Id.* at 284. It further argued that interpreting Article 9(2) as a "fork-in-the-road"

provision would be inconsistent with Article 7(4), which guarantees investors the right to pursue litigation in the event of an expropriation. *Id.* at 285.

On June 28, 2016, the Tribunal issued an 88-page "Partial Award on Jurisdiction" ("Jurisdictional Award") confirming its jurisdiction over the dispute. The Tribunal specifically held that Article 9(2) of the BIT constituted an agreement to arbitrate the parties' dispute and that Olin was not precluded from invoking the arbitration clause due to its prior litigation in Libya. In arriving at these conclusions, the Tribunal expressly rejected Libya's argument that Article 9(2) amounted to a "fork-in-the-road" provision that required investors to make a "definitive and preclusive" choice between litigation and arbitration. *Id.* at 284. Among other reasons, the Tribunal noted that Article 9(2) did not include the words "definitive, irrevocable, or any other words suggesting that the choice of one forum would preclude the use of another." *Id.* at 302. It reasoned that these omissions were notable considering the language used in Libya's other bilateral investment treaties, which expressly state that the choice of arbitration or litigation is "definitive" and that the arbitration provision "shall not apply if the investor concerned has resorted to [litigation]." *Id.* at 301. The Tribunal also reasoned that the repeated use of the word "or" in Article 9(2) did not undermine its conclusion

because "or" "could plausibly have an inclusive meaning" and "is absent from the Arabic version of Article 9[(2)]." *Id.* at 302–03. Finally, the Tribunal noted that under Libya's interpretation of the provision, Article 9(2) would be inconsistent with Article 7(4) of the treaty, which "specifically grants investors the right to pursue court proceedings in the event of an expropriation." *Id.* at 303. Accordingly, the Tribunal unanimously rejected Libya's objection that Article 9(2) deprived the Tribunal of jurisdiction over the parties' dispute.

Shortly thereafter, the parties agreed to a timetable for the merits phase of the arbitration. In July 2017, the Tribunal held a three-day evidentiary hearing on the merits of Olin's claims. On May 25, 2018, the Tribunal issued its unanimous Final Award, concluding that Libya had breached its obligations under the BIT by expropriating Olin's investment and by failing to accord it fair and equitable treatment as required by Articles 2(2), 3, and 7 of the treaty. Of the $147,882,000 in damages that Olin had requested, the Tribunal awarded it €18,225,000. The Tribunal also awarded Olin $773,000 for the costs and fees of the arbitration and €1,069,687 for general legal costs and expenses. In the Final Award, the Tribunal reiterated its finding that it had jurisdiction over the dispute despite Olin's decision to pursue litigation prior to commencing arbitration.

On December 11, 2020, Olin sought confirmation of the Final Award in the Supreme Court of the State of New York, New York County. On May 10, 2021, Libya removed that petition to the Southern District of New York. Libya subsequently filed an opposition to Olin's petition and moved to dismiss the petition on *forum non conveniens* grounds. *See id.* at 436. In its memorandum of law opposing the petition, Libya argued that the district court was required to review the Tribunal's Jurisdictional Award *de novo* because its objection to the Tribunal's jurisdiction raised an issue of arbitrability and the parties had not "clearly and unmistakably" agreed to commit such issues to the arbitrators. *See* Opp'n to Mot. to Confirm Arbitration Award, at 8–10. Libya argued that upon review of the Tribunal's decision on jurisdiction, the district court should vacate the Final Award because the arbitrators erred in concluding that Article 9(2) allowed Olin to arbitrate the dispute after filing suit in a Libyan court. *See id.* Olin responded that Libya's jurisdictional objection did not concern a question of arbitrability requiring independent review and that, in the alternative, the district court was required to defer to the Tribunal's jurisdictional decision because the parties had agreed to submit issues of arbitrability to the Tribunal. *See* Reply in Supp. of Pet. to Confirm Arbitration Award, at 5–10. Olin further argued that

under any standard of review, the Final Award should be confirmed. *See id.* Finally, as to Libya's cross-motion to dismiss the petition, Olin argued that Libya failed to establish that dismissal was warranted on *forum non conveniens* grounds. *See id.* at 13–19.

On March 23, 2022, the district court confirmed the Final Award and denied Libya's motion to dismiss the petition. *See Olin Holdings Ltd. v. State of Libya*, No. 21-CV-4150 (JGK), 2022 WL 864507, at *8 (S.D.N.Y. Mar. 23, 2022). In confirming the Final Award, the district court concluded that it was required to review the Tribunal's decision on jurisdiction with "considerable deference" because Libya's objection raised a "procedural gateway issue" that is "presumptively reserved for the arbitrators." *Id.* at *4. The district court further reasoned that "even if Libya were correct that the Jurisdictional Award is fairly characterized as a decision on arbitrability," deference was still required because the record contains "clear and unmistakable evidence of the parties' intent to arbitrate arbitrability." *Id.* at *4–5. Specifically, the district court noted that "Libya and Olin agreed in their TOR to resolve their dispute through arbitration pursuant to a set of procedural rules that delegated arbitrability to the arbitrators—in this case, the ICC Rules." *Id.* at *5. On the basis of the parties' adoption of those rules, the district court concluded that

Case 22-825, Document 121-1, 07/12/2023, 3541020, Page14 of 36

"the parties clearly and unmistakably intended for the arbitrator to determine arbitrability." *Id.* Applying a deferential standard of review, the district court confirmed the Final Award, concluding that the Tribunal's Jurisdictional and Final Awards were "plainly rational." *Id.* at *6. The district court additionally rejected Libya's *forum non conveniens* argument, reasoning that the public and private interest factors did not justify dismissal. *See id.* at *8–9. The court entered judgment on April 14, 2022, and Libya appealed on the same day.

## DISCUSSION

### I. THE DISTRICT COURT'S REVIEW OF THE TRIBUNAL'S JURISDICTIONAL AWARD

Libya's principal claim on appeal is that the district court was required to independently review the Tribunal's decision on jurisdiction before confirming the Final Award. In support of this claim, Libya advances two arguments. First, it argues that its objection to the Tribunal's jurisdiction must be reviewed *de novo* because it challenges "the existence and construction of the purported arbitration agreement," Appellant's Br. at 14, and "[p]arties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place," *id.* at 23 (quoting *Doctor's Assocs. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019)). Second, it argues that even if a valid arbitration agreement existed

between the parties, the district court erred by reviewing the Tribunal's decision with deference because its jurisdictional objection raises an issue of arbitrability, not a "procedural gateway issue," and the parties did not "clearly and unmistakably" agree to submit such issues to arbitration. For the reasons set forth below, we conclude that (1) a valid arbitration agreement existed at the moment Olin submitted the dispute to the ICC and (2) the parties unquestionably agreed to arbitrate issues of arbitrability before the Tribunal.[4]

**A. The Existence of an Arbitration Agreement**

Questions concerning the formation and existence of an arbitration agreement must be resolved by the courts in the first instance. *See Doctor's Assocs.*, 934 F.3d at 251 ("[P]arties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place." (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299–301 (2010)). This is because "[a]n agreement that has not been properly formed is not merely an unenforceable contract; it is not a contract at all. And if it is not a contract, it cannot serve as the basis for compelling arbitration." *Id.* As such, before an agreement to arbitrate can be enforced, we "must first determine whether such [an] agreement

[4] We review the district court's decision on these issues *de novo*. *See Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144, 153 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2889 (2022).

Case 22-825, Document 121-1, 07/17/2023, 3542001, Page16 of 36

exists between the parties." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017); *see also Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022) ("The district court must first determine whether an agreement to arbitrate exists between the parties.").

Libya argues that its objection to the Tribunal's jurisdiction is actually a challenge to the existence of a valid arbitration agreement between the parties. Specifically, it contends that Article 9(2) of the BIT requires investors to make a "preclusive choice" between litigation and arbitration and that, therefore, its offer to arbitrate the instant dispute "terminated" the moment Olin filed its lawsuit in a Libyan court. Appellant's Br. at 10, 14. According to Libya, because the central issue in this case is whether an arbitration agreement was entered into in the first place, the district court was required to independently review the Tribunal's decision on jurisdiction. *See* Appellant's Reply Br. at 6. We disagree.

We have consistently recognized that when one party is a signatory to a bilateral investment treaty containing a provision for arbitration, the treaty "constitutes a standing offer to arbitrate disputes covered by the [t]reaty," and "a foreign investor's written demand for arbitration completes the agreement in writing to submit the dispute to arbitration." *Republic of Ecuador v. Chevron Corp.*,

Case 21-825, Document 321-1, 07/12/2023, 3542020, Page17 of 36

638 F.3d 384, 392–93 (2d Cir. 2011) (internal quotation marks omitted); *see also Schneider v. Kingdom of Thailand*, 688 F.3d 68, 71–72 (2d Cir. 2012) ("The existence of an arbitration agreement between [the investor] and Thailand is beyond dispute. Thailand, 'by signing the [treaty], and [the investor] by consenting to arbitration, have created a separate binding agreement to arbitrate.'" (quoting *Republic of Ecuador*, 638 F.3d at 392)); *Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144, 154 (2d Cir. 2021) ("Mongolia, '"by signing the [1991 Treaty], and [Petitioners-Appellants], by consenting to arbitration, have created a legal separate binding agreement to arbitrate."'" (quoting *Schneider*, 688 F.3d at 71)), *cert. denied*, 142 S. Ct. 2889 (2022). In so holding, we have noted that bilateral investment treaties, such as the one at issue here, simply create "a framework through which foreign investors . . . can initiate arbitration against parties to the Treaty." *Republic of Ecuador*, 638 F.3d at 392. Accordingly, "[a]ll that is necessary to form an agreement to arbitrate is for one party to be a BIT signatory and the other to consent to arbitration of an investment dispute in accordance with the Treaty's terms." *Id.*

Even where a BIT creates a standing offer to arbitrate, a BIT may also specify conditions to be satisfied before an agreement to arbitrate is finalized. Here,

Article 9 of the BIT contains two procedural preconditions to arbitration. First, Article 9(1) requires investors to provide the Contracting Party with written notification of the dispute and to attempt to "settle the[] dispute[] amicably." BIT, art. 9(1). Article 9(2), in turn, provides that investors must wait "six months from the date of the written notification" before submitting the dispute, "at the choice of the investor," to the "competent court of the Contracting Party" or one of several arbitral tribunals. *Id.* art. 9(2).

Olin complied with these requirements by providing Libya with written notice of the dispute and submitting the dispute to "the Arbitral Tribunal of the International Chamber of Commerce in Paris."[5] *Id.* By initiating the arbitration, Olin accepted Libya's "standing offer" to arbitrate investment disputes arising under the BIT and "created a separate binding agreement to arbitrate between the parties." *Republic of Ecuador*, 638 F.3d at 392; *see also ZF Auto. US, Inc. v. LuxShare,*

---

[5] Olin filed its request for arbitration just four months after it provided Libya with written notice of the dispute. During the jurisdictional phase of the arbitration, Libya argued that Olin's failure to comply with the six month "cooling-off period" rendered its request for arbitration invalid. The Tribunal disagreed, concluding that it would be "[in]appropriate to reject [Olin's] claim on the basis that its [request for arbitration] was premature" because Olin "did attempt to engage . . . in amicable settlement negotiations without any success," and "[i]n view of the political situation in Libya at that time[,] . . . it was reasonable for [Olin] to expect that no settlement would be reached before the elapse of the cooling-off period." J. App'x at 306–07. Libya did not challenge this portion of the Tribunal's jurisdictional decision before the district court and does not do so on appeal.

*Ltd.*, 142 S. Ct. 2078, 2090 (2022) (noting that agreements to arbitrate under bilateral investment treaties are formed when investors initiate arbitration). Libya's objection therefore goes to the validity or enforceability of "an already-binding arbitration contract[,]" not "the contract's formation in the first place."[6] *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 41 (2014); *see Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 n.2 (2010) ("The issue of the agreement's 'validity' is different from the issue [of] whether any agreement between the parties 'was ever concluded'" (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006))). Libya cannot now "disown its agreed-to obligation to arbitrate *all* disputes, including the question of arbitrability." *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 211 (2d Cir. 2005).

Libya's arguments to the contrary are unavailing for two reasons. First, the BIT does not expressly state that the offer to arbitrate set forth in Article 9(2) extends only to investors who have not previously submitted their dispute to a "competent court of the Contracting Party." BIT, art. 9(2). Because "[a] treaty is primarily a contract between two or more independent nations," *Whitney v.*

[6] Libya appears to concede as much in its principal brief, noting that "[t]he dispute here is based squarely on a construction of the arbitration provision itself" and presents "a question of 'whether' that provision applies to Olin's claim . . . ." Appellant's Br. at 27 (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)).

*Robertson*, 124 U.S. 190, 194 (1888), we interpret its provisions using the same "principles which govern the interpretation of contracts in writing between individuals," *Sullivan v. Kidd,* 254 U.S. 433, 439 (1921); *see Georges v. United Nations*, 834 F.3d 88, 93–94 (2d Cir. 2016). One such basic principle of contract law is that conditions to the formation of a contract "must be expressed in plain, unambiguous language." *Id.* at 94; *see also id.* ("Conditions precedent to most contractual obligations . . . are not favored and must be expressed in plain, unambiguous language." (quoting *In re Timely Secretarial Serv., Inc.*, 987 F.2d 1167, 1174 n.7 (5th Cir. 1993)); *see also* 13 Williston on Contracts § 38:13 (4th ed. 2023) ("Contract conditions are generally disfavored . . . [and] will not be found unless there is unambiguous language indicating that the parties intended to create a conditional obligation."). In *BG Grp.*, for example, the Supreme Court considered whether a local litigation requirement in a bilateral investment treaty between the United Kingdom and Argentina operated as a condition precedent to Argentina's consent to arbitrate investment disputes. *See* 572 U.S. at 40. Concluding that the provision only impacted "*when* the contractual duty to arbitrate arises, not *whether* there is a contractual duty to arbitrate at all," *id.* at 35 (emphasis in original), the Court reasoned, in part, that "[t]he Treaty nowhere says that the provision is to

operate as a substantive condition on the formation of the arbitration contract, or that it is a matter of such elevated importance that it is to be decided by courts[,]" *id.* at 40. Here, Article 9 contains no express substantive condition or limitation on Libya's offer to arbitrate disputes under the treaty. Accordingly, no provision of the Article could reasonably be framed as a condition on the formation of an agreement to arbitrate. *See SCS Comms., Inc. v. Herrick Co., Inc.*, 360 F.3d 329, 341 (2d Cir. 2004) (holding that a condition was precedent to performance because the contract language did not explicitly state that it was precedent to formation); *see also Gove v. Career Sys. Dev. Corp.*, 689 F.3d 1, 5 (1st Cir. 2012) ("[T]he non-occurrence of a condition precedent does not render an agreement invalid. It simply means that the duty to perform does not arise.").

Second, Libya's claim that Article 9(2) contains a "qualified" or "limited" offer to arbitrate is undermined by its conduct during the arbitration. *See Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 546–52 (1991) (holding that treaty interpretation can be informed by parties' post-enactment conduct). At no point during the proceedings did Libya object to the Tribunal's jurisdiction on the ground that no binding arbitration agreement existed between the parties. Instead, Libya consistently argued that the Tribunal should "decline jurisdiction" because (1)

Olin was not an "investor" within the meaning of Article 9, *see* J. App'x at 253; and (2) Olin "exercised a final and irrevocable choice in favor of Libyan courts to resolve the dispute arising out of its investment, thereby foregoing its right to submit [the] dispute to an arbitral tribunal," *id.* at 276. The fact that Libya did not affirmatively frame its arguments as challenging the very existence of an agreement to arbitrate suggests that it did not view its offer to arbitrate to be as limited as it now contends. *Cf. BG Grp.*, 572 U.S. at 48 n.1 (Sotomayor, *J.*, concurring) ("[T]here is a difference between arguing that a party has failed to comply with a procedural condition in a binding arbitration agreement and arguing that noncompliance with the condition negates the existence of consent to arbitrate in the first place.").

In sum, we conclude that a binding agreement to arbitrate was formed between the parties when Olin submitted its request for arbitration to the ICC. Because Libya's jurisdictional arguments implicate Olin's right to arbitrate under a binding arbitration agreement, not the existence or formation of the agreement in the first place, the district court was not required to independently review the Tribunal's decision on jurisdiction.

**B. Who Should Decide Issues of Arbitrability**

We now turn to Libya's alternative argument that even if an agreement to arbitrate existed between the parties, the district court was still required to independently review its objection to the Tribunal's jurisdiction because it raises an issue of arbitrability and it did not "clearly and unmistakably" agree to submit such issue to arbitration. We evaluate the district court's decision on this issue *de novo*. *See Schneider*, 688 F.3d at 71.

Where an arbitration agreement is "silent on the matter of who primarily is to decide 'threshold' questions about arbitration, courts determine the parties' intent with the help of [two] presumptions." *BG Grp.*, 572 U.S. at 34. First, "courts presume that the parties intend courts, not arbitrators, to decide . . . disputes about 'arbitrability.' These include questions such as 'whether the parties are bound by a given arbitration clause,' or 'whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.'" *Id.* (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)). Courts are required to independently decide those issues "unless the record supplies 'clear and unmistakable evidence' that the [p]arties agreed to submit the issue to arbitration." *Beijing Shougang*, 11 F.4th at 154 (quoting *First Options of Chi., Inc. v. Kaplan*, 514

U.S. 938, 944 (1995)). Second, "courts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration." *BG Grp.*, 572 U.S. at 34. These procedural preconditions "include claims of waiver, delay, or a like defense to arbitrability," as well as "the satisfaction of prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate," whose effect is to "determine[] when the contractual duty to arbitrate arises, not whether there is a contractual duty to arbitrate at all." *Id.* at 35 (emphases and internal quotation marks omitted).

Here, the parties disagree over whether the Tribunal's Jurisdictional Award addresses the substantive arbitrability of the dispute or, instead, a "procedural gateway" issue to arbitration. Libya argues that its jurisdictional objection raises an issue of arbitrability because it turns on whether Olin was permitted to arbitrate its investment dispute in the first place. Olin, in response, argues that Libya's objection is akin to a claim of waiver or estoppel, which "generally fall into [the] . . . group of issues presumptively for the arbitrator." Appellee Br. at 3 (quoting *Republic of Ecuador*, 638 F.3d at 394). We need not address this issue because, even assuming Libya's objection to the Tribunal's jurisdiction is fairly characterized as

a question of arbitrability, the parties clearly and unmistakably agreed to arbitrate such issues in the first instance.

When "parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Schneider*, 688 F.3d at 72 (quoting *Contec*, 398 F.3d at 208); *see also Contec*, 398 F.3d at 208 (holding that the adoption of arbitration rules empowering arbitrator to "rule on his or her own jurisdiction" constituted clear and unmistakable evidence of the parties' intent to delegate issues of arbitrability to the arbitrator). In determining whether such rules have been incorporated, we have looked to both the text of the relevant investment treaty, *see Republic of Ecuador*, 638 F.3d at 394, and the procedural rules adopted by the parties at the outset of the arbitration, *see Beijing Shougang*, 11 F.4th at 155 ("[W]e discern no reason to conclude that evidence of intent to submit arbitrability issues to arbitration may be found only in arbitral agreements, and not in subsequent agreements reached by parties during an arbitration."). In *Republic of Ecuador*, for example, we held that a bilateral investment treaty's incorporation of the United Nations Commission on International Trade Law arbitration rules provided "clear and unmistakable"

evidence of the parties' intent to arbitrate issues of arbitrability because "Article 21 of those rules [provides] that the arbitrator 'shall have the power to rule on objections . . . to the existence or validity of the arbitration agreement.'" 638 F.3d at 394.

Here, Article 9(2) expressly authorizes Cypriot investors to submit disputes arising under the BIT to the "Arbitral Tribunal of the International Chamber of Commerce [ICC]." BIT, art. 9(2). ICC Rules presumptively apply to disputes submitted to the ICC.[7] Article 6, section 3 of those rules provides that claims "concerning the existence, validity or scope of the arbitration agreement," and "any question of jurisdiction . . . shall be decided directly by the arbitral tribunal," unless the Secretary General provides otherwise.[8] International Chamber of Commerce, Arbitration Rules, art. 6(3) (Jan. 1, 2012). Accordingly, by signing the

[7] During oral argument, counsel for Libya acknowledged, in relevant part, that "the reference to ICC Rules in the BIT" amounted to "an agreement to arbitrate under ICC rules if [the Court] finds that an agreement was formed." Oral Argument at 34:30–34:41. As noted above, we find that such an agreement was formed in this case.

[8] Per the TOR, the 2012 ICC rules governed the arbitration between Olin and Libya. When the BIT went into effect in 2005, the 1998 ICC Rules were still in effect. As relevant here, Article 6(2) of the 1998 Rules similarly empowered the Tribunal to decide questions of arbitrability in the first instance. *See* ICC Rules, art. 6(3) (1998) ("[I]f any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement . . . any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself."); *see also Shaw Grp.*, 322 F.3d at 122 (noting 1998 ICC Rules "assign the arbitrator initial responsibility to determine issues of arbitrability"); *Apollo Computer, Inc. v. Berg*, 886 F.2d 469, 472–73 (1st Cir. 1989) (same regarding ICC rules in effect in 1989).

Case 21-825, Document 321-1, 07/12/2023, 3540201, Page 27 of 36

BIT, Libya "clearly and unmistakably" agreed to send questions of arbitrability, including challenges to the validity and enforceability of the agreement, to the Tribunal in the first instance. *See Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 122 (2d Cir. 2003) (holding that an arbitration clause subjecting disputes to ICC rules constituted clear and unmistakable evidence of parties' intent to delegate arbitrability issues to arbitrator); *see also Beijing Shougang*, 11 F.4th at 157 ("[W]e have previously cited language in the [ICC] Rules as evidence of the parties' clear and unmistakable intent to submit the issue of arbitrability to the arbitrators . . . ."). The district court, therefore, was required to defer to the Tribunal's resolution of Libya's jurisdictional objections when reviewing the Jurisdictional Award. *See Schneider*, 688 F.3d at 73–74 (explaining that where parties "clearly and unmistakably intend to refer questions of arbitrability to the arbitrators 'in the first instance[,]' . . . a district court considering whether to confirm the award must review the arbitrators' resolution of such questions with deference" (citation omitted)).

Libya's conduct during the arbitration only reinforces the conclusion that it "clearly and unmistakably" agreed to send questions of arbitrability to the Tribunal. We have previously held that "[p]arties 'clearly and unmistakably'

evidenced their intent to submit arbitrability issues to arbitration where they agreed to submit jurisdictional issues to the arbitrator during the first phase of the arbitration." *Beijing Shougang*, 11 F.4th at 157. As noted previously, Libya agreed at the outset of the proceedings to bifurcate the arbitration into a "jurisdictional phase" and "merits phase." J. App'x at 245. In so doing, Libya agreed that the Tribunal would adjudicate its jurisdictional objections before addressing the merits of Olin's claims.[9] *See id.* at 252. Libya then fully participated in the "jurisdictional phase" of the proceedings, arguing in two written submissions that the Tribunal lacked jurisdiction to consider the merits of the dispute. *See id.* at 282 (summarizing Libya's objections, including its argument that Article 9 is a "mechanism of irrevocable choice which is alternative and not cumulative or successive" and pursuant to which "[t]he investor has to make a definitive choice between [a] national and international tribunal and [must] comply with its choice"). Libya did not adequately object to the Tribunal's competence to decide the issues of arbitrability raised in its submissions. Instead, it urged the Tribunal

---

[9] In the Jurisdictional Award, the Tribunal noted that the parties' written submissions presented four "issues to be decided in th[e] Partial Award." J. App'x at 252. Quoting from Libya's written brief, the Tribunal stated that "Issue No. 2" required it to consider whether "[Olin is] precluded from bringing forth these arbitral proceedings due to the fact that it has already pursued court proceedings in Libya, and . . . doesn't meet the requirements of Article 9 of the BIT . . . ." *Id.*

to adopt its interpretation of Article 9 and "decline" jurisdiction over the dispute. *Id.* at 246. After its arguments were rejected, Libya argued its case in the "merits phase" and participated in a three-day evidentiary hearing in Paris. Libya's conduct supports our conclusion that it intended to arbitrate questions of arbitrability. *See Beijing Shougang*, 11 F.4th at 157–58 (holding that a party's conduct "reinforced" the conclusion that the party intended to submit issues of arbitrability to the arbitrator where the party "affirmatively argue[d] [in support of] the tribunal's jurisdiction" and "at no point . . . object[ed] to the arbitrators resolving arbitrability issues").

Libya argues that its participation in the proceedings is not probative of its intent to arbitrate arbitrability because, as the Supreme Court held in *First Options*, "merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue, *i.e.*, a willingness to be effectively bound by the arbitrator's decision on that point." 514 U.S. 938, 946 (1995). Libya did not, however, "merely argu[e] the arbitrability issue to [the] arbitrator." *Id.* Unlike the respondents in *First Options*, who participated in the arbitration only to object to the arbitrability of the dispute, Libya participated in the entire proceeding and, in fact, independently urged the Tribunal to decide issues of arbitrability.

In sum, because the parties clearly and unmistakably agreed to submit issues of arbitrability to the Tribunal, Libya is not entitled to *de novo* judicial review of the Tribunal's jurisdictional conclusion.[10] *See Schneider*, 688 F.3d at 73; *see also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (holding that "a court possesses no power to decide the arbitrability issue" if "the parties' contract delegates the arbitrability question to an arbitrator"). We therefore affirm the district court's decision declining *de novo* review of the Tribunal's Jurisdictional Award.

## II. CONFIRMATION OF THE TRIBUNAL'S AWARD

Having determined that Libya is not entitled to independent review of the Tribunal's jurisdictional decision, we review the Tribunal's Awards with "considerable deference" to the arbitrator's findings. *BG Grp.*, 572 U.S. at 41; *see also Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 49 F.4th 802, 809 (2d Cir. 2022) (noting that courts should be "extremely deferential" to the

---

[10] Relying on *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 194 (2d Cir. 2019), and *First Options*, Libya additionally argues that independent judicial review is required because "the language and structure of Article 9" creates ambiguity as to the parties' "intention to delegate arbitrability to arbitrators." Appellant's Br. at 21. We disagree. By signing the BIT, Libya agreed to resolve certain investment disputes through arbitration under ICC Rules. As explained above, those rules clearly empower the tribunal to decide issues of arbitrability in the first instance. Accordingly, we find no ambiguity as to Libya's intent to arbitrate questions of arbitrability. *See Shaw Grp.*, 322 F.3d at 122 (concluding that parties' agreement to refer all disputes to the ICC constituted clear and unmistakable evidence of their intent to delegate arbitrability issues to an arbitrator).

findings of the arbitrator with respect to a foreign arbitral award), *cert. denied*, 143 S. Ct. 786 (2023). "We review a district court's decision to confirm an arbitration award *de novo* to the extent it turns on legal questions, and we review any findings of fact for clear error." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 388 (2d Cir. 2003).

When a party seeks confirmation of an arbitral award under the New York Convention, "[t]he court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207; *see Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 90 (2d Cir. 2005). "Article V of the Convention specifies seven exclusive grounds upon which courts may refuse to recognize an award." *Encyclopaedia Universalis*, 403 F.3d at 90. As relevant here, Article V(1)(c) provides that a court may refuse to enforce an arbitral award where the award "deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration." *Commodities & Mins. Enter.*, 49 F.4th at 818 (internal quotation marks omitted).

"The party opposing enforcement of an arbitral award has the burden to prove that one of the seven defenses under the New York Convention applies." *Encyclopaedia Universalis,* 403 F.3d at 90. "The burden is a heavy one, as 'the showing required to avoid summary confirmance is high.'" *Id.* (quoting *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997)). Regarding Article V(1)(c) challenges specifically, we have recognized that the defense "does not sanction second-guessing the arbitrator's construction of the parties' agreement." *Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 977 (2d Cir. 1974). Under the "deferential standard of review," an arbitration award should be confirmed upon a showing that there is a "barely colorable justification for the outcome reached." *Banco de Seguros del Estado v. Mut. Marine Office, Inc.*, 344 F.3d 255, 260, 264 (2d Cir. 2003) (quoting *Landy Michaels Realty Corp. v. Local 32B–32J*, 954 F.2d 794, 797 (2d Cir. 1992)).

Before the district court, Libya argued that the Final Award was unenforceable under Article V(1)(c) because the "Tribunal's Jurisdictional Award was irrational and absurd." *Olin Holdings Ltd.*, 2022 WL 864507, at *6. As noted above, the district court rejected this argument, concluding that the Tribunal's

interpretation of Article 9(2) of the BIT was "eminently reasonable" and supported by more than a "barely colorable justification." *Id.* On appeal, Libya simply reiterates the arguments it raised before the district court. Specifically, it argues that "even if reviewed with deference, the arbitrator's reasoning is so irrational and inconsistent with the essence of the arbitration clause that it cannot be enforced." Appellant's Br. at 40. We disagree.

As the district court correctly held, the Tribunal "analyzed the meaning of the relevant clauses in the [BIT], compared the wording in the [BIT] to comparable bilateral investment treaties, and reviewed the facts of the dispute." *Olin Holdings Ltd.*, 2022 WL 864507, at *6. The Tribunal's rejection of Libya' various arguments, including its claim that the language of Article 9(2) requires investors to choose between arbitration and litigation, is based on a plainly rational interpretation of the language of the BIT, and Libya's arguments to the contrary are unpersuasive. Accordingly, we reject Libya's argument that the Jurisdictional Award "cannot be confirmed under any standard of review," Appellant's Br. at 51, and affirm the district court's confirmation of the Tribunal's Awards, *see Beijing Shougang*, 11 F.4th at 161 ("[E]ven if we would not necessarily reach the same interpretation, any difference in opinion is not enough to conclude that the arbitrators 'stray[ed] from

interpretation and application of the agreement and effectively dispense[d] [their] own brand of . . . justice.'" (footnote omitted) (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010))).[11]

## III. DISTRICT COURT PROPERLY DENIED LIBYA'S MOTION TO DISMISS

Finally, we turn to Libya's argument that the district court erred in denying its motion to dismiss the petition on *forum non conveniens* grounds. We review such decisions for abuse of discretion. *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 70 (2d Cir. 2003). "Reversal is warranted only where the district court's decision rests on an error of law or clearly erroneous factual finding, where its decision otherwise cannot be located within the range of permissible decisions, or where the district court has failed to consider all relevant factors or has unreasonably weighed those factors." *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 40 F.4th 56, 70 (2d Cir. 2022) (citing *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005)).

[11] In arriving at this conclusion, we decline to express an opinion on the correctness of the arbitral tribunal's decision on jurisdiction. *See Banco de Seguros del Estado*, 344 F.3d at 262 (cautioning that when reviewing arbitral awards under the FAA, courts are not to determine whether the arbitrators "correctly" decided the merits of the dispute (quoting *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 824 (2d Cir. 1997))).

We have established a three-step framework for resolving a motion to dismiss based on *forum non conveniens* that requires: (1) determining the degree of deference to be afforded to the petitioner's choice of forum; (2) examining whether an adequate alternative forum exists; and (3) balancing the private and public factors enumerated by the Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947). *See Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73–74 (2d Cir. 2001) (en banc). The private factors to be considered are: (1) the relative ease of access to sources of proof; (2) the convenience of willing witnesses; (3) the availability of compulsory process for attaining the attendance of unwilling witnesses; and (4) the other practical problems that make trial easy, expeditious, and inexpensive. *See Gulf Oil*, 330 U.S. at 508. The public interest factors are: (1) court congestion; (2) avoiding difficult problems in conflict of laws and the application of foreign law; (3) the unfairness of imposing jury duty on a community with no relation to the case; and (4) the interest of communities in having local disputes decided at home. *Id.* at 508–09. The respondent bears the burden of establishing that the "balance of private and public interest factors tilts heavily in favor of the alternative forum." *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 189 (2d Cir. 2009).

Case 22-1825, Document 121-1, 07/12/2023, 3540201, Page 36 of 36

Here, the district court properly concluded that Olin's choice of forum was entitled to only a "small degree of deference" due to its "lack of a connection" to the district and that Paris, France, the location of the arbitration, was an adequate alterative forum for the dispute. *Olin Holdings Ltd.*, 2022 WL 864507, at *8. Regarding the public and private interest factors, the district court held that Libya fell well short of satisfying its heavy burden because it "fail[ed] to identify even one" factor that weighed in favor of dismissal. *Id.* at *9. On appeal, Libya makes "no persuasive argument identifying error in the factual or legal components of the district court's discretionary decision." *Esso Expl.*, 40 F.4th at 71. Accordingly, we affirm the district court's denial of Libya's cross-motion to dismiss the petition on *forum non conveniens* grounds.

**CONCLUSION**

For the reasons set forth above, we **AFFIRM** the judgment of the district court.